IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

SVEN FRANSSEN,

Defendant.

CRIMINAL CASE NO.

1:16-CR-00004-TCB-JFK

## **ORDER AND NON-FINAL REPORT AND RECOMMENDATION**

Pending before the court are Defendant Sven Franssen's preliminary and perfected motions [Docs. 25 and 52] to suppress his statement made on December 9, 2015, motion [Doc. 38] to dismiss based on lack of jurisdiction, and renewed motion [Doc. 51] for a bill of particulars.  The Government has responded to the pending motions [Docs. 58, 59, 60 and 65], and Defendant filed reply briefs in support of the motions to dismiss and for a bill of particulars [Docs. 63 and 64].

Also pending before the court is Defendant's preliminary motion [Doc. 40] to take depositions, pursuant to Fed. R. Cr. P. 15, of individuals residing outside the United States but who may have information material to Defendant's defense.  In order to perfect the motion or withdraw the motion, as Defendant determines is appropriate after reviewing the discovery materials and conducting an investigation of the charge

in the indictment, Defendant requested additional time which the Court granted. Defendant's deadline for perfecting or withdrawing the motion is currently May 6, 2017.  Accordingly, the court is not certifying this case ready for trial, and if not withdrawn, will address the motion [Doc. 40] for depositions in a supplemental order and/or report and recommendation.

## I.   Motion to Dismiss the Indictment

Defendant contends that the indictment charging Defendant with a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), fails to sufficiently allege extraterritorial jurisdiction to charge Defendant, who is not a citizen of the United States, as required by 18 U.S.C. § 1956(f).  [Docs. 38 and 64].  Defendant contends that the allegations in the indictment do not show that he engaged in unlawful conduct that occurred at least in part in the United States involving monetary transactions of a value exceeding $10,000.  [Doc. 38 at 3-4].  For this reason, Defendant argues that the court lacks jurisdiction over the criminal conduct charged in the indictment.  [Docs. 38 and 64].  The Government responds that the court's review is generally limited to the face of the indictment charging a money laundering conspiracy and that the indictment adequately pleads extraterritorial jurisdiction for the purpose of presenting the jurisdiction issue to the trial jury.  [Doc. 58].

AO 72A
(Rev.8/82)

### a.    Indictment

The indictment charges Defendant Franssen with conspiring with unindicted co-conspirator David-Manuel Da Silva and others "to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, wire fraud, in violation of [18 U.S.C. § 1343], with the intent to promote the carrying on of [that specified unlawful activity], and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of [18 U.S.C. § 1956(a)(1)(A)(I)]." [Doc. 1 ¶ 1].  The indictment then provides background information including that "Da Silva was the co-owner, President and Director of 21 Celsuis Inc., a Canadian corporation" and, through the corporation, "operated an internet-based affiliate marketing website at Marketbay.com."  [Id. ¶ 3].  A Dutch company owned and operated by Defendant Franssen, Certo Business Solutions B.V., processed "at least in part" "[p]ayments for products purchased through affiliate marketing websites [associated] with Marketbay.com[.]"  [Id. ¶ 4].

The indictment next sets forth the manner and means by which the money laundering conspiracy operated.  The indictment alleges that some of the products sold

3

on the "websites [associated] with Marketbay.com were promoted through fraudulent and illegitimate means" and provided as an example a marketed product called "Adobe Reader 10," which, although featuring an Adobe logo, "was not an Adobe-branded product and was not authorized for sale by Adobe." [Id. ¶ 5]. The indictment alleges that Defendant knew that affiliates of "Marketbay.com were promoting and selling products through false and fraudulent means" and alleged that software products being sold could be downloaded elsewhere for free and/or that products being promoted for sale "were not actually available to sell, or were being sold in violation of a copyright or trademark." [Id. ¶ 6]. These products "were sold to customers throughout the United States, including customers in the Northern District of Georgia . . . ." [Id. ¶ 7]. The indictment further alleges that Defendant was warned "that his company was processing payments from the sale of products that were being promoted through false and fraudulent means[, but that Defendant] advised and encouraged [co-conspirators] to conceal and disguise the false and fraudulent nature" of these product sales. [Id. ¶ 8]. Finally, the indictment alleges that during the conspiracy, Defendant's "company processed over $1.5 million in revenue generated from the sale of products that were falsely and fraudulently promoted through Marketbay.com" representing the proceeds of the wire fraud activity and being designed to promote the wire fraud activity. [Id.

4

¶ 9].  The indictment alleged that all of the conduct set forth was in violation of 18 U.S.C. § 1956(h).  [Doc. 1].

**b.    Discussion**

Defendant is charged with conspiring, in violation of 18 U.S.C. § 1956(h), to violate the money laundering provision of 18 U.S.C. § 1956(a), which provides in pertinent part:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-
>
> (A)(I) with the intent to promote the carrying on of specified unlawful activity . . . [shall be guilty of an offense against the United States].

18 U.S.C. § 1956(a)(1)(A)(i).  And section 1956(h) provides in pertinent part:  "Any person who conspires to commit any offense defined in this section . . . shall be subject to the same penalties as those proscribed for the offense the commission of which was the object of the conspiracy."   18 U.S.C. § 1956.   Defendant contends that the indictment does not sufficiently allege jurisdiction for the conspiracy because Defendant, who is not a citizen of the United States and not found in the United States during commission of the offense, is not alleged to have engaged in financial transactions in the United States.  [Doc. 38].

5

Defendant's allegation calls into question the extraterritorial jurisdiction of §

1956.  As Defendant acknowledges, 18 U.S.C. § 1956(f) provides for such jurisdiction

in pertinent part as follows:

> There is extraterritorial jurisdiction over the conduct prohibited by this
> section if-
>
> (1) . . . in the case of a non-United States citizen, the conduct occurs in
> part in the United States; and
>
> (2) the transaction or series of related transactions involves funds or
> monetary instruments of a value exceeding $10,000.

18 U.S.C. § 1956(h).

The Eleventh Circuit Court of Appeals recently reiterated the law regarding

attacks on the sufficiency of an indictment:  "By now it has become well-established

that '[t]he sufficiency of a criminal indictment is determined from its face.'. . .  'For

an indictment to be valid, it must contain the elements of the offense intended to be

charged, and sufficiently apprise the defendant of what he must be prepared to meet.'

. . .  'An indictment not framed to apprise the defendant with reasonable certainty, of

the nature of the accusation against him is defective, although it may follow the

language of the statute.'"  United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir.

2006) (citations omitted); and see United States v. Salman, 378 F.3d 1266, 1268 (11th

Cir. 2004) ("'There is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of sufficiency of the evidence. . . . The sufficiency of a criminal indictment is determined from its face.'") (citation omitted). In this regard, "an indictment must be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecution for the same offense. . . . An indictment satisfies these requirements as long as the language therein sets forth the essential elements of the crime." United States v. Cole, 755 F.2d 748, 759 (11th Cir. 1985); see also United States v. Dabbs, 134 F.3d 1071, 1079 (11th Cir. 1998) ("We deem an indictment sufficient if it (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense.").[1]

District Court Judge Batten, however, ruling on the same issue pending before this court, noted, "in ruling on a motion to dismiss for lack of jurisdiction, it is sometimes appropriate to go beyond the face of the indictment and consider evidence

---

[1]Excepting the issue of extraterritorial jurisdiction, Defendant does not otherwise argue that the indictment fails to adequately plead a § 1956(h) money laundering conspiracy. [Docs. 38 and 64].

7

relevant to jurisdiction." <u>United States v. Galvis-Pena</u>, 2012 WL 425240, at \*3 (N.D. Ga. February 9, 2012) (citing <u>United States v. McPhee</u>, 336 F.3d 1269, 1271 (11th Cir. 2003)).  That being said, Judge Batten also noted an important caveat to consideration of evidence on the question of jurisdiction.

> [O]nly those defenses "that the court can determine without a trial of the general issue" may be raised by pretrial motion.  Fed. R. Cr. P. 12(B)(2). Thus, a jurisdictional defense that is "intermeshed with questions going to the merits" of the case should not be determined by pretrial motion. <u>United States v. Ayarza-Garcia</u>, 819 F.2d 1043, 1048 ([11th] Cir. 1987). Indeed, such questions are for the jury to decide.  <u>United States v. Tinoco</u>, 304 F.3d 1088, 1104-05 ([11th] Cir. 2002).

<u>Galvis-Pena</u>, 2012 WL 425240, at \*3.

The court also looks to Rule 7(c) of the Federal Rules of Criminal Procedure which provides in pertinent part:

> The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government.  It need not contain a formal introduction or conclusion.  A count may incorporate by reference an allegation made in another count.  A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means.  For each count, the indictment . . . must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated. . . .

Fed. R. Crim. P. 7(c) (as amended 2009).

8

Taking into account Rule 7(c)'s requirements, "the Eleventh Circuit has previously described as legally sufficient an indictment that (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." United States v. Perraud, 672 F. Supp. 2d 1328, 1345 (S.D. Fla. 2009) (quoting United States v. Jordan, 582 F.3d 1239, 1245 (11th Cir. 2009)) (internal quotation marks omitted).  In judging the sufficiency of an indictment, courts are cautioned to use a "broad and enlightened standpoint of common sense and right reason rather than [a] narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding."  Id. (citations and internal quotation marks omitted); and see United States v. Hill, 2010 WL 128314, at *3 (N.D. Ga. January 13, 2010) ("[w]hen analyzing challenges to the sufficiency of an indictment, courts give the indictment a common sense construction, and its validity is to be determined by practical, not technical, considerations") (citation and internal quotation marks omitted).  "Furthermore, an indictment for conspiracy need not be as specific as an indictment for a substantive count."  United States v. Harrell, 737 F.2d 971, 975 (11th Cir. 1984); accord United

9

States v. Stoll, 2010 WL 5313486, at *3 (S.D. Fla. November 23, 2010) (same).  The indictment in this case meets these requirements.

Both parties rely on the district court decision in United States v. Stein, 1994 WL 285020 (E.D. La. June 23, 1994), to make their arguments.  However, the decision, while providing useful analysis of the extraterritorial jurisdiction established by § 1956(f), is of limited value when addressing the specific allegations in this case because the district court in Stein was evaluating jurisdictional allegations for a defendant charged, alone, for violation of 18 U.S.C. § 1956(a) and who was not charged in a conspiracy under § 1956(h), as is Defendant Franssen.  Rejecting the defendant's argument in Stein concerning the extent of the court's jurisdiction, the court held, "It is plain from both the purpose of section 1956 and its legislative history that Congress did not intend to limit section 1956 so that it would only apply to defendants who are actually present in the United States." Id., at *4.  Instead, the court stated, "[I]t was intended to reach situations in which "'*the transaction* occurred in whole or in part in the United States.' . . . It is the entire transaction that forms the offense conduct, not merely its initiation or conclusion." Id., at *5 (citation omitted; emphasis in original).  This analysis of the provision is persuasive.

10

The court, then, based on the 1956(a) offense charged solely against that defendant, found that the allegation that the defendant, himself, "initiate[d] a transfer of funds from a place within the United States to [a] place outside the United States[, albeit electronically,]" was sufficient to establish "extraterritorial jurisdiction, because a portion of the conduct occurred in this country." Id.  That finding must be considered in light of the charge in that case.  However, Defendant Franssen attempts to extend Stein further than the facts of the case allow by contending that Stein stands for the proposition that "for purposes of the extraterritorial jurisdiction provisions, the action of co-defendants and co-conspirators are not the focus." [Doc. 64 at 3].  The conduct of any other defendant, with respect to the money laundering charge, was not in issue in Stein.  However, in the pending case against Defendant Franssen, the court finds that the all of the alleged offense conduct, including that of the alleged co-conspirators, should be considered.  See Galvis-Pena, 2012 WL 425240, at *3 & n.3 (rejecting the defendant's argument, with respect to the money laundering conspiracy charge, "that there is no evidence that he personally made any transfers into or out of accounts in the United States[,]" the court stated, "[e]ven if Galvis-Pena did not personally make transfers into or out of accounts in the United States, he could be subject to the Court's jurisdiction for conspiring to do so or for aiding and abetting

AO 72A
(Rev.8/82)

others in doing so"); and see United States v. Sadighi, 199 F.3d 1334, *3 (9th Cir. 1999) (finding extraterritorial jurisdiction for money laundering conspiracy over the alleged conduct of all co-conspirators, as each is liable for the actions of the others, and noting that the "government has the power to prosecute every member of a conspiracy that takes place in United States territory, even those conspirators who never entered the United States").

The indictment in this case alleges that the money laundering conspiracy operated within the United States by promoting the carrying on of the underlying wire fraud conspiracy.  [Doc. 13 ¶ 1].  The affiliated marketing website, operated by Defendant's co-conspirator Da Silva, Marketbay.com, allegedly offered for sale in the United States products promoted by using fraudulent and illegitimate means - promotion activity Defendant allegedly was aware was fraudulent and encouraged to continue.  [Id. ¶¶ 2-3, 5-8].  These fraudulently promoted products were allegedly sold to customers in the United States, including the Northern District of Georgia, and Defendant's company processed over $1.5 million in revenue generated from the sale of these products, which would have included processing payments received from individuals located within the United States.  [Id. ¶¶ 4, 7-9].  Contrary to Defendant's contention, the indictment alleges not only conspiratorial acts by co-conspirators

12

within the United States for which Defendant can be held accountable but also actions on his own behalf - processing payments from customers located in the United States which constituted a "series of related transactions . . . of a value exceeding $10,000." 18 U.S.C. § 1956(f).  The indictment alleges that "the transferred funds[, that is, payments for the fraudulently promoted products,] originated in the United States[; t]hus a portion of each transaction occurred in the United States" as required for extraterritorial jurisdiction pursuant to § 1956(f).  United States v. Garcia, 533 Fed. Appx. 967, 982 (11th Cir. 2013).  As found by the court in Stein, but applied to the § 1956(h) charge herein, the instant indictment's allegations indicate that Defendant and/or his co-conspirators "initiate[d] a transfer of funds from a place within the United States to a place outside the United States, [establishing] extraterritorial jurisdiction, because a portion of the conduct occurred in this country."  1994 WL 285020, at *5.

The indictment sufficiently alleges extraterritorial jurisdiction under § 1956(f) for the money laundering conspiracy charged pursuant to § 1956(h).  Additionally, any further consideration of this issue pretrial is inappropriate.  As Judge Batten stated in Galvis-Pena, "[T]he issue of extraterritorial jurisdiction hinges on whether the underlying acts of money laundering occurred at least in part in the United States.  [An

13

issue that] is intermeshed with questions going to the merits of the case because the [c]ourt would have to consider evidence of the alleged criminal conduct in order to resolve it." Galvis-Pena, 2012 WL 425240, at *4.

### c.     Conclusion

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 38] to dismiss based on lack of jurisdiction be **DENIED**.

## II.    Motion to Suppress Statement

Defendant filed a preliminary motion [Doc. 25] to suppress his December 9, 2015, statement alleging that the statement was obtained in violation of his Fifth and Sixth Amendment rights.  After the evidentiary hearing was held on the motion on September 2, 2016, [Doc. 49],[2] Plaintiff filed a perfected motion [Doc. 52] to suppress in which he only asserts that his Sixth Amendment right to counsel was denied because he did not knowingly and voluntary waive this right when the interviewing agents failed to inform him before the interview began that a warrant for his arrest had been issued the day before the interview.  The Government filed a response to the perfected motion to suppress arguing that the record supports a finding that Defendant's waiver of his Miranda rights established a waiver of Defendant's Sixth Amendment right to

---

[2]Citations to the evidentiary hearing transcript are:  (Tr. at ).

14

counsel and that Defendant had abandoned any other grounds for suppressing the statement. [Doc. 60]. The court agrees that Defendant's failure to present arguments on any other grounds for suppressing his statement constitutes abandonment of all claims except that raised in his perfected motion. See United States v. Zekic, 2010 WL 4962985, at *1 (N.D. Ga. October 28, 2010) (citing Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.")), adopted by 2010 WL 4967825 (N.D. Ga. December 1, 2010); accord United States v. Rosso, 2015 WL 7115860, at *28 n.26 (N.D. Ga. November 12, 2015) (noting that, although the defendant initially argued that she did not voluntarily, knowingly and intelligently waive her Fifth Amendment rights, she apparently abandoned that argument because "her post-hearing brief focuse[d] exclusively on a violation of her Sixth Amendment right to counsel"). And the court recommends that Defendant's motions to suppress his statement based on his Sixth Amendment right to counsel be denied.

### a.   Background Facts

On December 8, 2015, Internal Revenue Service ("IRS") Special Agent Stefan Langmandel and Federal Bureau of Investigation ("FBI") Special Agent Roderick

15

Coffin sought and obtained a federal warrant for the arrest of Defendant Sven Franssen because they were aware that Defendant would be traveling to the United States on December 9, 2015, on his way to Belize, with a stopover at the Atlanta Hartsfield-Jackson International Airport.  (Tr. at 3-6, 13-14; Def. Exh. 2).  The agents hoped to interview Defendant when he arrived in U.S Customs at the airport and decided not to initially inform Defendant that they had a warrant for his arrest in the hopes of having an open dialogue with Defendant about the conduct under investigation and his associates.  (Tr. at 6, 10-11, 16-20).

Agent Langmandel, on direct examination, when asked why the agents decided not to advise Defendant about the arrest warrant, stated, "We had and still have an open investigation for a money laundering conspiracy, and we wanted to continue an open dialogue with Mr. Franssen, wanted to keep it nonconfrontational and just get him to have an open dialogue with us."  (Tr. at 10, 26-27).  On cross-examination, the agent was questioned further about the reason for not advising Defendant about the arrest warrant, inquiring whether the agents thought that Defendant might be less likely to talk with them if he knew he would be arrested.  The agent responded, "The interview might turn confrontational and he - - I guess yes."  (Tr. at 18).  The agent

16

agreed that, in order to maintain an open dialogue and to have Defendant answer questions, Defendant was not initially told about the warrant. (Tr. at 18).

When Defendant exited his international flight from Norway, Customs and Border Protection ("CBP") officers escorted him to the international passenger processing area for initial screening and then to an interview room where Agents Langmandel and Coffin, along with FBI Task Force Officer Mark Nadeau, a CBP officer, were waiting. (Tr. at 7, 16). The room, containing a conference table with chairs, was approximately ten feet by six feet. (Tr. at 7). Defendant was not handcuffed or restrained during the interview which was audio recorded from beginning to end. (Tr. at 7-8; Gov't Exh 1).[3] The agents began the discussion with general conversation acknowledging that Defendant was probably tired[4] and probably had some questions and that he might be confused about this meeting with the agents. (Interview Tr. at 2-3). The agents also explained that they would like to talk to him and hoped that Defendant would answer some questions, but Agent Coffin advised

---

[3]After the hearing, the Government provided a transcript of the audio recording which has been reviewed by counsel for Defendant, who does not object for the purpose of ruling on the motion to suppress the court using the transcript. The transcript will be cited to as: (Interview Tr. at ). And the transcript will be included in the record and marked as Gov't Exh. 1 Transcript.

[4]The interview began at approximately 9:30 p.m. (Tr. at 19-20).

17

Defendant that he did not have to talk to them and that, if at any time Defendant wanted an attorney, that would be "perfectly fine[.]"  (Interview Tr. at 3-4).  Agent Coffin, after confirming that Defendant understood English and using a Miranda rights form, advised Defendant that:

> [B]efore we ask you any questions, you need to understand your rights.  Like I said, you have the right to remain silent.  You don't have to answer any question that we ask you.  Anything that you say can be used against you in court.  You have the right to talk to a lawyer before we ask you any questions or during the questioning and if you can't afford a lawyer, you know, the Government would get you one.  And if you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.  Basically this means you can talk to us until you want to stop talking to us.  So you have that option.

(Tr. at 8-9; Interview Tr. at 4-5; Gov't Exh. 2).

Defendant read over the form and then signed the waiver.  (Tr. at 9; Interview Tr. at 5-6; Gov't Exh. 2).  Agent Langmandel testified that Defendant appeared to knowingly and intelligently execute the waiver, that Defendant was not under duress and that nothing indicated that Defendant did not understand his rights or his choice about waiving his rights.  (Tr. at 9-10).  During this time, and not clear if before or after executing the waiver of rights form,  Defendant said, "Just a question.  Is there a particular reason why I'm here?"  (Tr. at 25; Interview Tr. at 6).  Agent Coffin

18

responded, "Yes.  And we'll talk about that."  To which Defendant responded, "Oh, okay."  (Interview Tr. at 6).

The agents then had a general discussion with Defendant about his travels and obtained background information from Defendant about where he lived and his occupation, including the businesses that he had operated over the years.  (Interview Tr. at 6-12).  When Defendant mentioned Certo Business Solutions, a credit card processing company he operated, the agents inquired into the operation of that business with respect to products being purchased off the internet.  Defendant explained how the payment processing worked and discussed some difficulties with the European Value Added Tax ("VAT") in operating his business.  (Interview Tr. at 12-31).  Defendant eventually mentioned Da Silva and Joe Paluhmeeairee ("Joe") who operated a Canadian company called 21 Celsius which was involved with a number of websites.  (Interview Tr. at 31-32).  At this point, Agent Coffin advised, "So part of our interest is in that company.  That's part of why you're here talking with us today."  He asked if Defendant was familiar with "MarketBay."  (Interview Tr. at 32).  Defendant identified MarketBay as "an affiliate system of" 21 Celsius and explained what he meant by affiliate.  (Interview Tr. at 32-35).

19

Defendant also answered questions about how products were purchased off the websites with the payments processed on his secure website for which Defendant was paid a small transaction fee and a percentage of the product sale price. (Interview Tr. at 35-43). Agent Coffin then advised, "So to share with you a little more information, we've been investigating MarketBay for awhile." And the agent asked Defendant if he was aware of any illegal activity on MarketBay or by 21 Celsuis. (Interview Tr. at 43-44). Defendant denied any such knowledge or knowing much about how the product sales were conducted. (Interview Tr. at 44-46). Agent Coffin advised Defendant that he was in possession of a lot of emails between Da Silva and/or Joe and Defendant, those emails indicating that Defendant was not being totally honest about his knowledge of MarketBay's operation. The agent advised Defendant that the agents believed Defendant was aware that MarketBay's activities were illegal and that Defendant would have "another opportunity to be honest . . . ." (Interview Tr. at 46-48).

After stating that he might have misunderstood what the agents were asking, Defendant began discussing the problems with the VAT and a payment/fine of $20,000 due to problems with customers charging back amounts on credit cards used to make product purchases. (Interview Tr. at 48-52). Although the agents continued to point

20

out language in the emails indicating that Defendant was aware that the products were being sold using fraudulent methods, Defendant provided explanations for the events discussed in the emails and continued to deny any knowledge of illegal activity by pointing out that his company only processed the payments for the products and that he was not involved in product sales. (Interview Tr. at 48-54). Defendant maintained his position even when specific emails were discussed and said, "I have come here because I don't think that I have anything to hide or, you know, to be we say aware of doing - doing wrong. And I try to be honest and I give my view and I acknowledge here to you and I'm not hiding things." (Interview Tr. at 55). Despite the agents continuing to point out that they did not believe Defendant was being honest and that, until he was honest with them, Defendant would not be able to cooperate, Defendant responded, "No, I'm sorry, but I cannot agree with this because I was not aware that that was an illegal operation." (Interview Tr. at 55-60). The agent advised Defendant that "if [he was] gonna be able to help [the] investigation, which would help [him] because to be honest with [him, he was] in a little bit of trouble here . . . . [He] wouldn't be sitting in a room talking to an FBI agent, an IRS special agent and a [CBP] officer unless there was a serious issue here and there is a serious issue here." (Interview Tr. at 60). Defendant continued to deny awareness of any illegal activity

21

and, acknowledging that he did not want "to take the fall for" the others involved, he stated "[t]hat's why I have been sitting here and talking to you and not - I've been talking freely and I think, you know, in the best interest for everyone and not asked for a lawyer." (Interview Tr. at 61-63).

Defendant continued to deny knowledge of illegal activity and refused to admit to any illegal activity because he viewed how the product sales were conducted differently than the agents. (Interview Tr. at 63-70). Agent Coffin advised Defendant that he did not have anymore questions and asked if Defendant had anything else he would like to tell the agents. Defendant responded, "I wouldn't know." (Interview Tr. at 70). At this point, Agent Coffin advised Defendant about the arrest warrant and handcuffed Defendant. (Interview Tr. at 70). After explaining to Defendant what would happen over the next couple of days and that an immigration detainer had been lodged against Defendant, the interview, which lasted approximately two hours, ended. (Tr. at 11; Interview Tr. at 71-73). As noted from the transcript of the interview, according to Agent Langmandel, Defendant was not under duress or coerced and did not ask to terminate the interview or for an attorney. (Tr. at 11).

Additional facts will be set forth as necessary during discussion of the motions to suppress statement.

**b.     Discussion**

In contending that he did not knowingly, intelligently and voluntarily waive his Sixth Amendment right to have counsel present during the interview on December 9, 2015, Defendant focuses on the fact that the agents did not advise him of the federal arrest warrant charging him with a violation of federal money laundering laws prior to the interview.  [Doc. 52].  He argues that, without that information, he did not appreciate the consequences of agreeing to the interview and that the waiver of his Miranda rights did not constitute a valid waiver of his Sixth Amendment right to counsel.  [Id.].  The Government, apparently agreeing that Defendant's Sixth Amendment right to counsel had attached at the time of the interview, responds that advising Defendant of his right to remain silent and to have a lawyer adequately advised him of his Sixth Amendment rights and that the waiver was valid.  [Doc. 60].

The Sixth Amendment right to counsel "is indispensable to the fair administration of our adversary system of criminal justice."  Brewer v. Williams, 97 S. Ct. 1232, 1239 (1977).  And, "[w]hatever else it may mean, the right to counsel granted by the Sixth . . . Amendment[ ] means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him 'whether by way of formal charge, preliminary hearing, indictment,

23

information, or arraignment.'" Id. (citations omitted).  Defendant contends that the filing of the complaint and the issuance of the federal arrest warrant by the United States Magistrate Judge triggered Defendant's Sixth Amendment rights.  [Doc. 52 at 4-5].  The Government apparently assumes that to be the case as the issue is not addressed in its brief in opposition to the motion to suppress statements.  [Doc. 60]. However, the court does not agree that Defendant's Sixth Amendment right to counsel attached on December 9, 2015, due to the issuance of the arrest warrant.

The filing of a criminal complaint and a subsequent arrest on that complaint does not necessarily trigger a defendant's Sixth Amendment right to counsel.  See Lumley v. City of Dade City, Florida, 327 F.3d 1186, 1195 (11th Cir. 2003); United States v. Langley, 848 F.2d 152, 153 (11th Cir. 1988) (noting that the Sixth Amendment "right to counsel attaches only after the government initiates adversarial judicial proceedings . . . and has committed itself to prosecute the defendant" and holding that the "mere filing of a complaint and the issuance of a warrant for the defendant's arrest . . . does not meet this . . . test").  Recently in Rothgery v. Gillespie County, Texas, 128 S. Ct. 2578, 2592 (2008), the Supreme Court reaffirmed its prior holdings and "what an overwhelming majority of American jurisdictions understand in practice: a criminal defendant's initial appearance before a judicial officer, where

24

he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel." And see Philmore v. McNeil, 575 F.3d 1251, 1257-58 (11th Cir. 2009) (citing Rothgery); Stokes v. Singletary, 952 F.2d 1567, 1576-77 (11th Cir. 1992) (finding that a defendant has a Sixth Amendment right to counsel as of his appearance at the first formal charging proceeding); Fleming v. Kemp, 837 F.2d 940, 947-48 (11th Cir. 1988) (finding that hearing before judicial officer on pending charge, whether or not a formal arraignment, triggered Sixth Amendment right to counsel).  At that point, the government is committed to prosecute a defendant and the defendant "'finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'" Rothgery, 128 S. Ct. at 2583 (citation omitted).  In United States v. Turner, 2015 WL 4042148 (N.D. Ga. June 30, 2015), District Judge Evans applied this reasoning to find that a defendant's Sixth Amendment right to counsel had not attached at the time of his arrest and questioning on January 31, 2013, on a warrant issued earlier in January, because his first appearance in court did not take place until February 1, 2013.  Id., at **3-4 (citing Rothgery, 128 S. Ct. at 2592).  Accordingly, although Defendant Franssen had been charged in and arrested based on a federal criminal complaint, as of December 9, 2015,

25

when he was interviewed, he had not appeared before a federal Magistrate Judge and been formally advised of the charge and had restrictions on his liberty considered; therefore, his Sixth Amendment right to counsel had not attached. Defendant's motion to suppress is due to be denied on that ground.

However, even if Defendant's Sixth Amendment right to counsel attached on December 8, 2015, when he was charged in the federal arrest warrant, Defendant's motion should nevertheless be denied. Once a defendant's right to counsel attaches, absent a valid waiver, he or she is entitled to have counsel present with him or her during any interview with law enforcement authorities. See Brewer, 97 S. Ct. at 1240 ("[O]nce adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him."); Fellers v. United States, 124 S. Ct. 1019, 1022 (2004) ("We have held that an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel.'") (citation omitted). The question before the court is whether Defendant validly waived his Sixth Amendment right to counsel prior to the December 9, 2015, interview. See United States v. Richitelli, 420 Fed. Appx. 861, 867 (11th Cir. 2011) ("A Sixth Amendment

violation occurs when (1) government agents (2) deliberately elicit incriminating statements from an accused after he has been indicted, outside the presence of counsel, and (3) in the absence of any waiver of his Sixth Amendment rights."); United States v. Gunn, 369 F.3d 1229, 1237 (11th Cir. 2004) (the Sixth Amendment prohibits admitting a statement deliberately elicited from a defendant by the government after the initiation of adversary criminal proceedings unless counsel is present or there is a valid waiver of the right to counsel).

The Supreme Court has held that a defendant can waive his Sixth Amendment right to counsel and that advising a defendant of his Miranda rights provides adequate guarantees of a knowing and intelligent waiver.  Patterson v. Illinois, 108 S. Ct. 2389, 2397 (1988) ("As a general matter, then, an accused who is admonished with the warnings proscribed by the Court in Miranda . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.").  Accordingly, "[i]f . . . the accused is not represented and has not requested counsel, an advisement of Miranda rights is sufficient to safeguard the Sixth Amendment right, and any statement given following such advice of rights will be presumed to be the product of a voluntary waiver."  Gore v. Secretary for the Dep't of

27

Corrections, 492 F.3d 1273, 1302-03 n.68 (11th Cir. 2007).  However, in reaching its decision, "the Supreme Court in <u>Patterson</u> specifically set aside the question of whether a defendant must additionally be informed of an indictment to make the waiver knowing and intelligent . . . ."  <u>United States v. Mansfield</u>, 2014 WL 6879054, at *2 (N.D. Ga. December 4, 2014).  Although not yet addressed by the Eleventh Circuit Court of Appeals in a published opinion,[5] most of the circuit courts of appeal "that have addressed the issue have held that the accused need not be told that he has been indicted before making a post-indictment waiver of counsel."[6]  <u>Id.</u> (holding in the

---

[5] However, in <u>United States v. Espinoza</u>, 635 Fed. Appx. 739 (11th Cir. 2015), in an unpublished decision, the Eleventh Circuit Court of Appeals rejected a defendant's argument that the waiver of his rights was involuntary and uninformed due, in part, to the fact that the agents "intentionally withheld that he had been indicted . . . ."  <u>Id.</u> at 749.  Noting that the defendant provided no authority requiring "interrogating officers to disclose at the outset that an individual is facing an active indictment," the court concluded that the defendant's "erroneous belief that he was being interrogated for immigration purposes, even if resulting from the agents' decision to withhold information about the indictment, does not undermine the otherwise valid <u>Miranda</u> waiver."  <u>Id.</u>

[6] <u>See, e.g.</u>, <u>United States v. Bing Yi Chen</u>, 433 Fed. Appx. 14, 15-16 (2nd Cir. 2011); <u>United States v. Chadwick</u>, 999 F.2d 1282, 1285-86 (8th Cir. 1993); <u>United States v. Muca</u>, 945 F.2d 88, 89-91 (4th Cir. 1991); <u>Riddick v. Edmiston</u>, 894 F.2d 586, 590-91 (3rd Cir. 1990); <u>Quadrini v. Clusen</u>, 864 F.2d 577, 586-87 (7th Cir. 1989).  <u>And see</u> <u>United States v. Bryson</u>, 110 F.3d 575, 582 (8th Cir. 1997) ("Our court has held . . . that law enforcement officers, with the consent of a suspect, may question even suspects who are unaware of their own indictment.  Our court has further held that the officers have no duty to make such suspects aware of an indictment."); <u>United States</u>

case before the court that defendant, who had been indicted but was not informed of that fact before being interviewed, was properly administered <u>Miranda</u> warnings and "had voluntarily, knowingly and intelligently waived his Sixth Amendment right to counsel"). This court finds the decisions in <u>Mansfield</u> and in the other cases cited persuasive as applied to Defendant's contention that he should have been informed of the fact of the federal arrest warrant in addition to his <u>Miranda</u> rights.[7]

_____

v. Noorzai, 545 F. Supp. 2d 346, 354-55 (S.D. N.Y. 2008) (rejecting a defendant's argument that "an information requirement-notice that the person is under arrest or other formal accusation-[be added] to the <u>Miranda</u> warning requirement articulated in <u>Patterson</u>" in order to find that a defendant properly waived his Sixth Amendment right to counsel and rejecting the defendant's argument that <u>Chadwick</u> had imposed such a requirement).

[7]The same conclusion is reached in the Fifth Amendment context. In <u>Colorado v. Spring</u>, 107 S. Ct. 851, 857 (1987), the Supreme Court found that a waiver of <u>Miranda</u> rights was knowingly made although the defendant claimed that he was not apprised of the nature of the charges which would be the subject of the interrogation. Finding that the defendant was advised of his right to remain silent and of the fact that anything he said could be used against him, the court held, "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." <u>Id.</u>; <u>see also</u> <u>United States v. Farley</u>, 607 F.3d 1294, 1327-28 (11th Cir. 2010) (extending <u>Spring</u> to intentional communication of misinformation); <u>United States v. Gaddy</u>, 894 F.2d 1307, 1312 (11th Cir. 1990). Nor must a defendant be informed of all the information that might be "useful" in making the decision whether to waive his <u>Miranda</u> rights, such as the offenses to be covered during the interrogation. <u>Spring</u>, 107 S. Ct. at 859. Noting that "the additional information could affect only the wisdom of a <u>Miranda</u> waiver," the Court held that "the failure of the law enforcement officials to inform [the defendant] of the subject matter of the interrogation could not affect [the defendant's] decision to waive his Fifth

Defendant Franssen was advised of his <u>Miranda</u> rights as evidenced by the testimony produced at the hearing; he does not argue to the contrary.  The court also finds that Defendant knowingly, intelligently and voluntarily waived those rights, including his Sixth Amendment right to counsel.   When Defendant exited his international flight from Norway, CBP officers escorted him to the international passenger processing area for initial screening and then to an interview room where Agents Langmandel and Coffin and Task Force Officer Nadeau were waiting.  (Tr. at 7, 16).  The room, containing a conference table with chairs, was approximately ten feet by six feet.  (Tr. at 7).  Defendant was not handcuffed or restrained during the interview which was audio recorded from beginning to end.  (Tr. at 7-8; Gov't Exh 1).  The agents began the discussion with general conversation acknowledging that Defendant was probably tired and probably had some questions and that he might be confused about this meeting with the agents.  (Interview Tr. at 2-3).  The agents also explained that they would like to talk to him and hoped that Defendant would answer some questions, but Agent Coffin advised Defendant that he did not have to talk to them and that, if at any time Defendant wanted an attorney, that would be "perfectly

_____

Amendment privilege in a constitutionally significant manner."  <u>Id.</u>

fine[.]"   (Interview Tr. at 3-4).   Agent Coffin, after confirming that Defendant

understood English and using a <u>Miranda</u> rights form, advised Defendant that:

> [B]efore we ask you any questions, you need to understand your rights.
> Like I said, you have the right to remain silent.  You don't have to answer
> any question that we ask you.  Anything that you say can be used against
> you in court.  You have the right to talk to a lawyer before we ask you
> any questions or during the questioning and if you can't afford a lawyer,
> you know, the Government would get you one.  And if you decide to
> answer questions now without a lawyer present, you have the right to stop
> answering at any time.  Basically this means you can talk to us until you
> want to stop talking to us.  So you have that option.

(Tr. at 8-9; Interview Tr. at 4-5; Gov't Exh. 2).

Defendant read over the form and then signed the waiver.  (Tr. at 9; Interview

Tr. at 5-6; Gov't Exh. 2).  Agent Langmandel testified that Defendant appeared to

knowingly and intelligently execute the waiver, that Defendant was not under duress

and that nothing indicated that Defendant did not understand his rights or his choice

about waiving his rights.  (Tr. at 9-10).

The only additional issue that Defendant raises concerning the waiver is the fact

that the agents did not answer his question at the beginning of the interview: "Just a

question.  Is there a particular reason why I'm here?"  (Tr. at 25; Interview Tr. at 6).

Agent Coffin only responded, "Yes.  And we'll talk about that."  To which Defendant

responded, "Oh, okay."  (Interview Tr. at 6).  The agents had decided, before the

31

interview, not to disclose to Defendant that they had a warrant for his arrest in the hopes of having a non-confrontational, open dialogue and due to some concerns that Defendant might not be as willing to agree to the interview if aware of the warrant. (Tr. at 10, 18, 26-27). However, the court notes that the agents did not lie to Defendant - he did not directly ask if he was under arrest or would be arrested, and as the interview was conducted, the agents did disclose increasing details about why they wanted to speak with Defendant, that is, their investigation of 21 Celsuis and MarketBay and their belief that Defendant was aware of illegal conduct involving those entities. (Interview Tr. at 31-32, 43-44). And, if Defendant had not liked the initial response to his inquiry, he could have simply refused to answer any questions. In fact, even when directly confronted by the agents with their belief that he was not being honest and being advised that he was in trouble, Defendant did not terminate the interview. (Interview Tr. at 46-51, 56-58, 60). Defendant did not confess and did not admit knowledge of fraudulent activity. (Interview Tr. at 46-50, 54-58, 60-67). Defendant's own statements indicate that he was speaking to the agents voluntarily and that, knowing that he could have, he did not request an attorney. Defendant, maintaining his lack of knowledge about illegal activity, said, "I have come here because I don't think that I have anything to hide or, you know, to be we say aware of

doing - doing wrong.  And I try to be honest and I give my view and I acknowledge here to you and I'm not hiding things."  (Interview Tr. at 55).  A few minutes later, Defendant continued to deny awareness of any illegal activity and, acknowledging that he did not want "to take the fall for" the others involved, stated "[t]hat's why I have been sitting here and talking to you and not - I've been talking freely and I think, you know, in the best interest for everyone and not asked for a lawyer."  (Interview Tr. at 61-63).

The failure to fully answer Defendant's question about why he was being interviewed is not sufficient to undermine the voluntariness of the waiver of his right to counsel.  Likewise, the agents' reasons for not disclosing the arrest warrant is not relevant to the court's inquiry.  In Farley, the defendant contended that he was tricked by the federal agent who told him that the questioning would concern a terrorism investigation when the purpose of the questioning concerned the defendant's attempted exploitation of a minor.  607 F.3d at 1326.  The court noted that the advice of rights form signed by the defendant "conveyed in clear language each of the warnings required by Miranda."  Id. at 1328.  The court in Farley stated, "Knowledge of what the agents really suspected him of doing would no doubt have been useful, possibly even decisive, to Farley in calculating the wisdom of answering their questions.  But

33

their deception on that point was not 'constitutionally significant,' because the lack of that information did not prevent Farley from understanding the nature of his rights and the legal consequences of waiving them." Id.  The court also stated that it was not relevant to the court's determination whether "the agents deliberately lied to Farley about the subject of the investigation in order to trick him into signing a waiver they thought he might not otherwise have signed." Id. at 1330.  Because "the only relevant state of mind is that of Farley himself[,]" the agents "subjective motives for the deception are not relevant." Id.

In United States v. Estrella, 2011 WL 4946907 (M.D. Fla. October 17, 2011), aff'd, 518 Fed. Appx. 822 (11th Cir. 2013), the district court applied the reasoning of Farley to the defendant's claim that his Sixth Amendment right to counsel was violated because his waiver, based on being advised of his Miranda rights, was ineffective due to police deception and trickery.  Id., at **3-4.  The defendant was arrested and appointed counsel by local authorities in connection with his involvement in drug transactions in Lee County, Florida, which also involved an attempted robbery of the undercover police officer conducting the transactions.  A firearm involved in those transactions was determined to have been stolen during a burglary in Cape Coral, Florida.  Id., at **1-2.  Officers from Cape Coral, after Defendant was appointed

34

counsel in Lee County, met with the defendant and asked to interview him about the burglary. When asked, the officers advised the defendant that he was not being charged with the burglary. After the defendant waived his <u>Miranda</u> rights, the officers questioned him about the burglary covering areas that overlapped with the drug transactions, particularly the attempted robbery of the undercover officer. <u>Id.</u>, at *2. The defendant was subsequently indicted by a federal grand jury based on facts arising out of the Lee County and Cape Coral incidents. <u>Id.</u> The district court held that the Cape Coral officers interrogated the defendant outside the presence of counsel and that those officers deliberately elicited incriminating statements at a time when the defendant's Sixth Amendment right to counsel had attached. <u>Id.</u>, at *3. The court found that the defendant had, however, properly waived his Sixth Amendment right to counsel and that the alleged trickery and deceit by the officers did not render his waiver invalid. <u>Id.</u>, at *4. The defendant contended that the officers were deceitful in advising him of the reason for the interview which he claimed was really for the purpose of obtaining information about the robbery of the undercover officer. <u>Id.</u>, at *5. Although the court found that the officers were not deceitful in conducting the interview, the court stated, "even if the detectives were being deceptive when they said they were investigating the Cape Coral case, nothing about the statement rises to the

35

level which would deprive defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." Id. (citing Farley, 607 F.3d at 1326-31). The same reasoning applies to the facts in this case.

And, "[g]enerally, courts have held statements involuntary because of police trickery only when other aggravating circumstances were also present." Farley, 607 F.3d at 1328. No such circumstances are present in the case before this court. Id. at 1331 ("Looking at the totality of the circumstances, nothing indicates that Farley's waiver of his rights was anything less than knowing and voluntary."). As noted, Defendant was not restrained or handcuffed during the interview. He did not appear to be under duress and was not coerced. He was advised of and appeared to understand his rights, as evidenced by his statements during the course of the interview that he was freely talking to the agents and had intentionally not requested an attorney. (Tr. at 7-10, 26-27; Interview Tr. at 3-6, 55, 63). The court finds that Defendant was advised of his Sixth Amendment right to counsel and that he knowingly, intelligently and voluntarily waived that right.

36

c.      **Conclusion**

For these reasons, the court **RECOMMENDS** that Defendant's motions [Doc. 25 and 52] to suppress his statement be denied on the ground that his Sixth Amendment right to counsel had not attached when the interview was conducted or, in the alternative, if his right to counsel had attached, that Defendant, being advised of his Miranda rights, knowingly, intelligently and voluntarily waived his right to counsel.

## III.   Bill of Particulars

In the renewed motion for a bill of particulars, Defendant seeks an order "directing the Government to identify the unlawful sales that generated the 'over $1.5 million in revenue' with which Mr. Franssen has been charged in the Indictment." [Doc. 51 at 3].  The Government responded that, besides the fact the requested information "does not pertain directly to any element of the money laundering conspiracy offense" charged in the indictment [Doc. 59 at 6], there is no document in the Government's possession that contains the information being requested by Defendant and that Defendant has all of the documentary information currently available to the Government which could be used to create such a document [Id. at 5-6].  In reply, Defendant revised the request for information and is now seeking "the

37

identity of the wire fraud products" and states that "the real purpose here is to obtain the identity of all of the products that were offered though commission of the alleged wire fraud offense." [Doc. 63 at 4]. Because Defendant revised the request in the renewed bill of particulars, the court directed the Government to file a reply. The Government responded to the revised request, first, noting that Defendant is not charged with a wire fraud offense but with conspiring to commit money laundering and that the Government is not required to prove the underlying specified activity alleged, that is, the wire fraud conduct. [Doc. 65 at 1-2]. The Government further points out that the indictment identifies one of the products fraudulently sold and generally alleges other types of products involved in the underlying fraudulent conduct and that, again, the Government "does not possess at this time a singular document which" provides the information that Defendant seeks but that Defendant has all of the documentary information in the Government's possession from which such a document could be created and is just as able as the Government to create such a document. [Id. at 3-5]. For the following reasons, the court denies Defendant's renewed request for a bill of particulars.

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize

AO 72A
(Rev.8/82)

surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." United States v. Warren, 772 F.2d 827, 837 (11th Cir. 1985); see also United States v. Hassoun, 477 F. Supp. 2d 1210, 1227-28 (S.D. Fla. 2007) ("A request for bill of particulars is, *inter alia*, befitting in those instances where defendant seeks further clarity and precision with regard to the charges that he is facing in order to adequately prepare a defense."). "Generalized discovery is not the proper function of a bill of particulars." Warren, 772 F.2d at 837 (citing United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981)); see also United States v. Roberts, 174 Fed. Appx. 475, 477 (11th Cir. 2006) (same). While the court "is vested with broad discretion in deciding whether a bill of particulars should be granted[,]" United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985), "'where an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense, failure to grant a request . . . may constitute reversible error[,]'" Id. (quoting United States v. Crippen, 579 F.2d 340, 349 (5th Cir. 1978)). The money laundering conspiracy count in the indictment, which has been set out in detail *supra*, sufficiently alleges the charge by stating the elements of the offense charged therein and by providing details regarding the manner and means Defendant Franssen participated in the charged conspiracy. [Doc. 1].

39

As the Government argues, Defendant is charged with a conspiracy to commit money laundering and not with wire fraud offenses; accordingly, the Government need not establish that Defendant committed a wire fraud offense. The decision of the Eleventh Circuit Court of Appeals in United States v. Martinelli, 454 F.3d 1300 (11th Cir. 2006), is helpful in addressing the proof required at trial and whether the details that Defendant seeks regarding the underlying wire fraud activity is material to his defense at trial. "'To obtain a conviction for a . . . money laundering conspiracy . . . the government bears the burden of proving beyond a reasonable doubt that: (1) two or more persons agreed to commit a crime, in this case a . . . money laundering violation; and (2) that [the defendant], knowing the unlawful plan, voluntarily joined the conspiracy.'" Id. at 1310 (citation omitted). In Martinelli, the defendant was charged with a money laundering conspiracy involving the "specified unlawful activity" of mail fraud and contended on appeal that the trial court erred by not instructing the jury on the elements of mail fraud because that offense was "a 'core element of the [money laundering conspiracy].'" Id. at 1310-11 (citation not provided). The court rejected the defendant's claim because he "was not charged with mail fraud and the government did not have to prove he committed mail fraud to convict him of conspiring to launder money[;]" instead, the defendant "simply had to

40

*know* the funds were derived from the specified unlawful activity of mail fraud." Id. at 1311 (emphasis in original); and see United States v. McCoy, 356 Fed. Appx. 335, 344 (11th Cir. 2009) (rejecting the defendant's argument that the jury had to be instructed on the elements of wire fraud "because it was an 'essential term within the scope of the indictment'" charging a money laundering conspiracy, the court held that "the government was not required to prove that offense to convict him of conspiring to launder money") (citation not provided).  And the Government need not prove the specific details of the underlying wire fraud conduct because the charged "'[c]onspiracy [to launder money] may be proven by circumstantial evidence and the . . . extent of [Defendant's Franssen's] knowledge of details in the conspiracy does not matter if the proof shows [he] knew the essential objective of the conspiracy.'" United States v. Kennard, 472 F.3d 851, 856 (11th Cir. 2006) (citation omitted).  The details that Defendant seeks regarding "the identity of all of the products that were offered through commission of the *alleged* wire fraud *offense*[,]" simply are not part of the Government's proof at trial or material to Defendant's defense of the only charged offense, that is, a conspiracy to launder money.

Further, the court notes that the fact that discovery materials are provided to a defendant is an appropriate factor to consider in deciding whether a bill of particulars

AO 72A
(Rev.8/82)

is warranted.  See Roberts, 174 Fed. Appx. at 477 ("A bill of particulars is not required where the information sought has already been provided by other sources, such as the indictment and discovery. . . ."); United States v. Al-Arian, 308 F. Supp. 2d 1322, 1359 (M.D. Fla. 2004) ("a bill of particulars is not typically warranted in so far as it seeks information already available through other sources") (citing United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986) ("Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment or discovery and inspection.")); see also United States v. Kunzman, 54 F.3d 1522, 1526 (10th Cir. 1995) (bill of particulars is not necessary when indictment is sufficiently specific and the defendant has access to the government's file); United States v. Caputo, 288 F. Supp. 2d 923, 925 (N.D. Ill. 2003) (same); United States v. Cooper, 283 F. Supp. 2d 1215 (D. Kan. 2003) (same).

As the Government outlines, in addition to the factual allegations in the indictment, which identifies at least one of the allegedly fraudulently marketed products and generally describes other types of products fraudulently marketed [Doc. 65 at 3], Defendant was provided with a wealth of information in discovery to enable him to adequately prepare his defense of the charge at trial [Id. at 4].  For example, in addition to receiving the discovery materials in this case, the Government provided

Defendant with materials pertaining to his co-conspirators in the related fraud cases, including a spreadsheet prepared by co-conspirator Da Silva "in which he himself labeled certain products that were being sold through Marketbey.com as 'risky'." [Id.]. The Government is not required to provide any further response to this request and will not be required to prepare a document, from the discovery materials in Defendant's possession, that captures the information being sought in the bill of particulars.

The court also finds that the request seeks evidentiary detail - in light of the information already set forth in the indictment and provided in discovery - that is not appropriate in a bill of particulars. See Roberts, 174 Fed. Appx. at 477 (a bill of particulars "'is not designed to compel the government to [provide] detailed exposition of its evidence'") (citation omitted); United States v. Scrushy, 2004 WL 483264, at *9 n.5 (N.D. Ala. March 3, 2004) ("[T]here is a difference between being surprised by the charge and being surprised by the evidence supporting a charge. The function of the bill of particulars is to reduce surprise at the *charge*, that is, to enable the defendant to identify what he is alleged to have done in violation of law. It is not to eliminate surprise with respect to evidence offered in support of a charge that is clearly understood by the defendant.") (emphasis in original); United States v. Giffen, 379 F. Supp. 2d 337, 346 (S.D. N.Y. 2004) ("The ultimate test in deciding whether a bill of

43

particulars should be ordered is whether the information sought is necessary, as opposed to helpful, in preparing a defense."). The court notes that the Government need not prove an overt act in furtherance of the money laundering conspiracy in order to establish Defendant's guilt at trial. Whitfield v. United States, 125 S. Ct. 687, 694 (2005) (The Supreme Court held "that conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1965(h), does not require proof of an overt act in furtherance of the conspiracy."); and see United States v. Wilson, 2013 WL 820726, at *2 (S.D. Ala. March 5, 2013) ("'[a] bill of particulars may not be used to compel the government to provide the essential facts regarding the existence and formation of a conspiracy[; n]or is the government required to provide defendants with all overt acts that might be proven at trial'") (quoting Rosenthal, 793 F.2d at 1227)).

Particularly, with respect to the type of evidentiary detail Defendant is seeking relating to the financial transactions, that is, the exact identity of the products fraudulently sold, underlying the money laundering conspiracy, courts have rejected such requests. See United States v. Conway, 2012 WL 5425316, at *4 (E.D. N.C. November 6, 2012) (due to discovery provided to defendant, the court denied the defendant's request that the government list "every financial transaction alleged to have occurred in furtherance of the conspiracy"); United States v. Chaidez-Ontiveros,

44

2011 WL 7574634, at **1-3 (N.D. Ga. October 25, 2011) (rejecting the defendant's request for a bill of particulars providing "the financial transactions allegedly connected to him as well as the dates and locations and financial accounts associated with those transactions"), report and recommendation adopted by 2012 WL 984269 (N.D. Ga. March 21, 2012); United States v. Russo, 483 F. Supp. 2d 301, 311 (S.D. N.Y. 2007) ("Defendants' requests regarding *which* of the alleged acts of wire fraud the particular laundered funds originated in . . . is simply a request 'to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars.'") (citation omitted; emphasis in original).

Furthermore, Defendant seeks the details about the acts in which *he* engaged in commission of the charged conspiracy.  It is doubtful that Defendant could establish that, without the Government providing the details about this evidence, he was not able to prepare a defense to the charged offense or was surprised.  In a case where the evidence being sought by a bill of particulars consists of activities in which a defendant participated or witnessed, the defendant "'could hardly have been surprised by the government's proof at trial.'"  United States v. Cantu, 557 F.2d 1173, 1178 (5th Cir. 1977) (quoting United States v. Pena, 542 F.2d 292, 293-94 (5th Cir. 1976)); see also United States v. Williams, 113 F.R.D. 177, 179 (M.D. Fla. 1986) (When the

45

information sought involves "events in which one or more of the defendants participated, or which occurred in one or more of the defendants' presence[, t]he Eleventh Circuit has held that this sort of information need not be furnished in a bill of particulars.") (citations omitted).   In this regard, the Government's evidence includes Defendant's emails - produced in discovery - "that [show] he knew some of the sales transactions he was processing were based on products that were illegitimate in one form or another."  [Doc. 65 at 4].

Defendant has not demonstrated that the information requested in the bill of particulars is material to preparation of his defense at trial.  For the reasons stated, the court **DENIES** Defendant's request [Doc. 51] for a bill of particulars.

## IV.   Conclusion

For the foregoing reasons and cited authority, the court

(1) **RECOMMENDS** that Defendant's motion [Doc. 38] to dismiss the indictment for failure to allege an essential element be **DENIED** and

(2) **RECOMMENDS** that Defendant's motion [Doc. 25 and 52] to suppress statements be **DENIED**; and the court

(1) **ORDERS** that Defendant's motion [Doc. 51] for a bill of particulars be **DENIED**.

46

As noted, remaining pending before the court is Defendant's preliminary motion [Doc. 40] to take depositions.  Defendant's deadline for perfecting or withdrawing this motion is May 6, 2017.

**IT IS SO RECOMMENDED AND ORDERED**, this 24th day of March, 2017.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

47